## HERRON v. CAMERON.

(Supreme Court, Appellate Division, First Department. April 7, 1911.)

1. BROKERS (§ 86*)—ACTIONS FOR COMMISSIONS—SUFFICIENCY OF EVIDENCE.

In a broker's action for commissions for procuring a tenant able to pay part of the expenses of erecting a building on defendant's lots, evidence *held* to show that an agreement between defendant and the prospective tenant of a certain date had been abandoned by mutual consent, and no new agreement made.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 86.*]

2. BROKERS (§ 85*)—COMMISSIONS—ACTIONS—ADMISSION OF EVIDENCE.

In a broker's action for commissions for procuring a tenant, in which the complaint alleged that the plaintiff procured a tenant able and willing to carry out his agreement to erect a 12-story building, evidence of negotiations by the prospective tenant for the erection of a 15½ or 16 story building was not admissible.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 85.*]

3. BROKERS (§ 54*)—COMMISSIONS—ABILITY OF PURCHASER.

A broker's agreement to procure a tenant able and willing to pay $50,000 a year for the property, and contribute one-fifth of the cost of a building to be erected, of which defendant's part should not exceed $250,000, was not performed where the prospective tenant owed over $150,000, and executions against him had been returned unsatisfied, he having no property, income, or credit.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 75–81; Dec. Dig. § 54.*]

Laughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by Ashley M. Herron against Margaret S. E. Cameron. From a judgment for plaintiff, and an order denying a motion for a new trial, defendant appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

Peter B. Olney, for appellant.
Edgar J. Nathan, for respondent.

DOWLING, J. This action is brought to recover the sum of $10,-500 as the commission of a real estate broker for negotiating a lease of the premises Nos. 185 and 187 Madison avenue, in the city of New York. The complaint sets forth the hiring in the month of March, 1907, by the defendant of the plaintiff as a broker to negotiate a lease of said premises, and that defendant particularly desired a tenant who would erect a new building on the property upon the terms stated by defendant; that in or about the said month the plaintiff secured one William C. Dewey as a tenant, and introduced him to defendant, and that an agreement in writing was duly made and executed between Dewey and defendant, bearing date March 15, 1907, as a result of plaintiff's efforts, as broker, by which agreement the tenant agreed to lease the premises for a period of 21 years at a rental of $50,000 per annum commencing May 1, 1908, and as an additional rent to pay all taxes, assessments, and water rents during said term, the tenant fur-

ther agreeing to erect a store and loft building 12 stories in height, covering substantially both lots, from plans and specifications representing both owner and tenant; that it was further agreed that the owner should furnish four-fifths and the tenant one-fifth of the contract cost of said building, with the proviso that the owner's contribution should not exceed $250,000. It was further alleged that the agreement provided, among other things, that it should be subject to mutually satisfactory arrangement respecting the contract cost of the building, and that, immediately that was agreed to, the final form of lease, as described in said agreement, should be signed by the respective parties thereto. The complaint then sets forth that, subsequent to the execution of said agreement between the defendant and Dewey, plans and specifications were prepared by the architects and approved by both the defendant and the tenant, and the contract cost of the proposed building was agreed upon by them.

Further it was averred:

"That after the defendant and the tenant had agreed upon the terms for the construction of a new building, in accordance with said agreement, the defendant unlawfully refused to carry out the terms thereof, although the said tenant was able, ready and willing to carry out the said agreement in accordance with all the terms and conditions thereof."

Defendant's agreement to pay plaintiff a commission of 1 per cent. on the rental for the term of the lease was then pleaded, making an amount due of $10,500, which had been duly demanded, but none of which had been paid.

The answer puts in issue substantially all the allegations of the complaint except the ownership of the property and the failure to make any payment to plaintiff, and sets forth, in effect: That plaintiff, knowing that defendant desired to obtain a responsible tenant for the premises in question pecuniarily able to perform the terms of the lease and to contribute a portion of the money necessary to improve the property, and knowing generally the character of the improvements which defendant intended to make on these premises and the provisions of the contemplated agreement, introduced William C. Dewey to defendant, through her brother, thereby representing to him that Dewey was a responsible person pecuniarily able to perform on his part the agreement in question. That, relying upon the representations so made, which were communicated to her by her brother, defendant entered into the agreement of March 15, 1907, with Dewey, called by her a tentative agreement, but that she thereafter discovered that Dewey was not a responsible man, and was not pecuniarily able to carry out the agreement on his part, and that, when plaintiff introduced Dewey as a responsible person, there were judgments of record against him to the amount of $79,000, on some of which executions had been returned unsatisfied; also, that Dewey had been or was about to be examined in proceedings supplementary to execution, and that, when plaintiff introduced Dewey, the latter was wholly irresponsible financially; and, further, that, when the defendant learned of Dewey's financial irresponsibility, what is termed the tentative agreement of March 15th was not carried out and fulfilled, and the same was thereupon abandoned and canceled. This is not the ordi-

nary case of a lease being obtained by a broker for an existing building. The defendant desired to improve her property and she wanted a reliable tenant for that purpose, who was to put up the building and take the lease. She desired to realize $35,000, clear, as ground rent, and was to get 6 per cent. upon her investment in the total cost of the building (in which her share was to be $250,000), making the total net return to her $50,000.

The plaintiff had produced one Cohen and one Fleischman as prospective lessees, but no agreement was reached with them. Then he suggested Dewey as one who would meet defendant's requirements. He admits that defendant's brother, who represented her throughout this transaction and with whom alone his dealings took place, had told him that he (Cameron) must be very careful that the person with whom he dealt was financially responsible; that he wanted a tenant who was able to contribute a part of the cost of the new building; that he wanted a man who would be able to furnish a bond sufficient to make secure the performance of the provisions of the lease. He admits that Cameron asked him, referring to Dewey, "Is he financially responsible?" to which plaintiff replied, "He has good credit." Cameron then inquired "He is financially responsible, is he?" to which plaintiff answered, "Yes." When these replies were made, plaintiff knew that defendant desired a responsible tenant, who would contribute at least $62,500 toward the cost of the new building to be erected, who would incur a liability for $50,000 rental per annum for a period of 21 years besides taxes, assessments, and water rates, and who could give a bond to insure his performance of his agreement. Plaintiff claims that he told Cameron that Dewey had been successful in many enterprises, but had encountered trouble in the Hotel Wolcott operation, owing to his wife's mental condition, by reason of which he could not get the necessary mortgages executed. He claimed to know much of Dewey's building operations, but his cross-examination disclosed that he was not familiar with their details, and only had a general idea of Dewey's activities in that direction. Plaintiff also testified that he told Cameron that Dewey had relatives, one Lincoln and one May, who were wealthy, and that the former was more or less acting for the latter two in the matter. Dewey himself said that he told Cameron of his building activities, and that he had unexpectedly become involved in difficulties in the Hotel Wolcott matter which had left him with large obligations, most of which he had taken care of; that he was struggling to pay off his debts, and had largely succeeded therein; and that he thought he had told him he could not take title in his own name because of his wife's mental condition, by reason whereof a clause was suggested to be inserted in the proposed lease, allowing its assignment. These statements of Dewey's were denied by Cameron, who denied as well that plaintiff ever told him, before the agreement was signed, of any trouble with the Hotel Wolcott operation, or of any mental trouble of Dewey's wife or even suggested that Dewey was acting in a representative capacity, for Lincoln, May, or any other person. He testified that he told plaintiff that as his sisters were seeking to get an income to live on from this property, in order to avoid any risk in putting up a building on their own account, they were

looking for a thoroughly experienced man of undoubted financial standing, who would not only bring experience to the erection of the building and help in making it a success as a business venture when completed, but who would bring financial strength to the operation; for, if they did not find that kind of a tenant, they might better carry on the operation themselves. He says that, when Dewey was suggested as a tenant, plaintiff said: "I met a man in the street yesterday who I believe is the very man we are looking for." Cameron inquired "What do you know about him?" Plaintiff replied, "I have known him for a number of years. He is a man of a great deal of experience, financial strength, willing and capable of carrying out such a scheme as we have been endeavoring to arrive at in the last two months." To this Cameron answered: "Is that so? Bring him down to see me, and we will try to come to terms."

It is Cameron's contention that he relied entirely on plaintiff's representations that Dewey was a responsible man, answering to all the requirements laid down for a prospective tenant, and that there was no disclosure made of any troubles he had ever encountered. So relying, an agreement in writing was entered into between defendant and Dewey on March 15, 1907, whereby defendant agreed to lease to Dewey for 21 years the premises in question at an annual rental of $50,000 per annum, besides the taxes, assessments, and water rates, rent to begin on May 1, 1908. At the expiration of the lease there was to be either a renewal for 21 years or a payment to the lessee of one-fifth of the then appraised value of the building. The following provision followed:

"Premises will be delivered to tenant for improvement immediately building contract has been approved and security for building has been provided, and tenant agrees at once upon obtaining possession to proceed to erect thereon a store and loft building of 12 stories in height, covering substantially both lots, according to plans and specifications hereinafter to be agreed upon."

Clinton & Russell were selected as architects to represent both owner and lessee, and were "to proceed with every diligence to get up pro forma plans and specifications, which are to be submitted to the owner and lessee for approval, and such plans and specifications are to be the basis upon which the lessee and architect are to arrive at a fair and equitable price at which the lessee is to undertake the erection and completion of the building." The lessee was to name three or more construction companies approved by the architect, and to select the builder therefrom. As soon as the pro forma plans, specifications, and contract cost of building had been agreed upon, the regular form of lease was to be signed, and the lessee was to furnish the owner with security or an approved bond in the sum of $75,000, liquidated damages to be paid to the owner in case the lessee failed to erect the building in accordance with the provisions of the contract. It was agreed that the owner should furnish four-fifths and the lessee one-fifth of the cost of construction, the owner in no event to furnish more than $250,000, so that any excess over $312,500 must be paid by the lessee, besides his original share, $62,500. The lessee was to pay his proportion of the costs concurrently with the owner,

and to assume all liability for damage or injury during the progress of the construction. As soon as possession was obtained by him, the lessee was to remove the existing buildings and proceed to erect the new one. The agreement then set forth numerous covenants and provisions to be included in the lease to be executed, including one for the payment of $12,500, on signing the lease, as the first quarter's rent in advance, and another as follows:

"The lease is to run to Mr. William C. Dewey, he, however, to have the right of assigning lease to ———."

This agreement, it is conceded, was not an enforceable one for a lease, and, standing alone, would not entitle plaintiff to his commissions, because it left to be agreed upon certain essential features, viz. (1) The pro forma plans and specifications for a 12-story building, still to be drawn by the architects; (2) the cost of construction of such a building. Dewey claims that he submitted the names of three builders, whereof F. T. Nesbitt & Co. were finally selected; Cameron saying that any of the three would suit him. After the agreement was executed, negotiations progressed for some time. Plaintiff claims to have seen a preliminary sketch for a 12-story building in Cameron's office, but it was not produced, and there is no other proof of its existence. Concededly no pro forma plans or specifications for a 12-story building were ever made. The representative of the architects testifies positively that they never drew plans for a 12-story building. Then the proposition changed from a 12-story building (as provided for by the written agreement) into a 15½ or 16 story one, and for this changed scheme of construction, plans, and specifications were prepared by the architects, and are in evidence. The first ones are termed "pro forma," were furnished to Dewey about April 19, 1907, and are for a 15½-story building. Thereafter other plans and specifications were made for a 16-story building, dated June, 1907, and purporting to be made for defendant. All of these plans cover the premises in question. Dewey claims that, when the 16-story building project was under consideration, Cameron agreed that defendant would contribute the entire cost of construction thereof—$350,000— Dewey waiving his 10 per cent. commission as builder on the cost. There had been prior talk that, if the cost exceeded $250,000, defendant must return the excess at the end of the term, if the lease was not renewed. Dewey claims that he told Cameron he was ready to give the bond, which was to be supplied by Nesbitt, but the latter is only willing to say that he was ready to give a bond to insure fulfillment of his own contract, if he obtained it. Meantime, Cameron testifies, and about April 1st, Dewey had notified him that he could not carry out the agreement of March 15th, and said that, if he could get fair terms on an entirely new proposition for a 16-story building, he felt sure he could make such financial arrangements as would enable him to carry it out. Such arrangements for a 16-story structure were being discussed, the agreement of March 15th having been abandoned by mutual consent, as claimed, and no new agreement having been reached, when on July 9, 1907, Dewey was examined in proceedings supplementary to execution under a judgment in favor of one Adler.

In that examination Dewey testified that he "held a tentative agree-ment with a woman named Cameron for a lease on the northeast cor-ner of Thirty-Fourth street and Madison avenue"; and, in substance, that he had never complied with the terms of the agreement of March 15, 1907, that nothing has been done under it, that it was abandoned, and new negotiations were taken up with a view of arriving at a new agreement which could be carried out. In the proceedings in question, Cameron was called as a witness, and he then testified that the agree-ment of March 15th had been abandoned, having been found impos-sible of performance, and negotiations were taken up for a new agree-ment. This Dewey, who was present, was asked to verify, and he said, "That is correct." Plaintiff claims that one of defendant's coun-sel said she would rather lose $40,000 than give the lease to Dewey, because it would be too profitable for him. Dewey claims that, after the examination referred to, the same attorney told him defendant would rather spend $75,000 fighting him than give him the lease, as he would make a profit of $25,000 yearly thereon. The attorney de-nies both these statements.

It appears without controversy that, when plaintiff introduced Dewey to Cameron, there were judgments of record against Dewey as follows: In favor of Robert R. Velie, for $709.87, filed February 15, 1906; in favor of Max Gorodiz, for $163.57, filed August 15, 1906; in favor of Jacob Maurer et al., for $329.83; in favor of Troy Laundry Machine Company for $2,785.19; in favor of Sigmund Ad-ler, some amount between $600 and $2,000—upon all of which execu-tions had been returned unsatisfied. There was also a judgment against him in favor of Frederick T. Kellogg for $73,952.39. He owed William A. Lincoln $26,000 for borrowed money, and was in-debted to him contingently in the further sum of $18,000 upon notes made by him and indorsed or assumed by Lincoln. He also owed Henry B. May an amount he could not fix, and $2,000 to John L. De Saules. He admitted he owed $125,000 over and above the indebted-ness due Lincoln. He had no personal property of any kind at this time, and no income or salary from any source.

From a judgment entered upon a verdict in favor of plaintiff for the full amount claimed, with interest, the present appeal is taken. It is apparent that the recovery is based upon a cause of action not pleaded, and that no recovery can be had upon the one pleaded. The complaint sets forth the production by plaintiff of a leseee able, ready, and willing to carry out the agreement of March 15, 1907, in accord-ance with all the terms and conditions thereof, and after an agreement upon the terms for the construction of a new building in accordance therewith; that agreement provided for the erection of a 12-story building only and upon explicit terms and conditions. It appears from this record that Dewey and defendant never agreed upon the plans and specifications of such a building, for, in fact, such were never drawn; that they never agreed upon the cost thereof; that the bond provided for never was tendered or furnished, nor does it appear that Dewey could have procured the same; that possession never was given of the premises; that the lease provided for never was signed; and that the rent for the first quarter never was paid.

[1] The preponderance of testimony is that the agreement of March 15th was abandoned and annulled by mutual consent, and that negotiations for a new arrangement were entered upon, which never resulted in an agreement.

[2] Defendant continually objected to the receipt of all evidence as to the negotiations for the erection of a 15½ or 16 story building, and the objections should have been sustained, for the proof was not within the scope of the pleadings, which limited the claim for recovery to a tenant ready and able to carry out an agreement for the erection and leasing of a 12-story building only; and the difference in the proposed terms for the other leases was radical.

[3] Moreover, it is apparent that plaintiff never produced a lessee who was, as he avers, "able, ready, and willing" to perform his agreement. Here was a builder owing over $150,000 consisting in part of judgments, whereon execution had been returned unsatisfied, with no property, real or personal, and no income or salary whatever. Had it not been for his admission that his agreement with defendant had been abandoned, a receiver would have been appointed upon his examination under the Adler judgment. There is no proof that he had credit. It would be difficult to imagine where it could be obtained. There is no proof that he had any financial support which would have insured his performance of his contract. The best proof to the contrary is his inability to satisfy judgments against him and avoid the danger of a receivership, which he only escaped by his absolute lack of any property rights whatever. The defendant had a right, in the exercise of that good faith, candor, and honesty which plaintiff was bound to exercise in her behalf, to have produced by him a lessee who answered the ordinary requirements at least of responsibility and solvency. This was not done. She was to allow the buildings upon the property owned by her to be torn down, the land to remain unproductive while the new building was being erected, and contribute $250,000 of her own money to the operation. It is obvious that she was vitally interested in securing what her representative instructed plaintiff was the only sort of tenant she would consider—one financially responsible and with enough money to enable him to carry out his engagements with her. This the plaintiff did not do.

The judgment and order must therefore be reversed, and a new trial ordered, with costs to appellant to abide the event.

INGRAHAM, P. J., and McLAUGHLIN and MILLER, JJ., concur. LAUGHLIN, J., dissents.